**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

Clifton Belcher,

               Plaintiff,

v.                                              Case No. 03-3261-JWL

Jon Loftness; Allen Beard;
Cindy Anderson; and
Scott Ashman;

               Defendants.

**MEMORANDUM & ORDER**

Plaintiff filed suit seeking monetary damages for injuries he sustained while incarcerated at the United States Penitentiary (USP) in Leavenworth, Kansas. The court has previously dismissed all claims except for plaintiff's *Bivens* claims against defendants Loftness, Beard, Anderson and Ashman in their individual capacities based on defendants' alleged failure to protect plaintiff from a November 21, 1999 assault by unknown inmates. This matter is presently before the court on defendants' motion for summary judgment (doc. #64). As set forth in more detail below, the motion is granted and plaintiff's complaint is dismissed in its entirety.

**I.    Facts**

The following facts, taken entirely from plaintiff's own deposition, are either uncontroverted or related in the light most favorable to plaintiff, the nonmoving party. Plaintiff arrived at USP Leavenworth on April 19, 1999. In plaintiff's underlying criminal case, he cooperated with the government to provide evidence against his co-defendants. As a result,

plaintiff had three documented separatees.   None of plaintiff's separatees were assigned to USP

Leavenworth.   On September 1, 1999, an inmate who identified himself as "Cornbread" approached

plaintiff to deliver a message from one of plaintiff's co-defendants whom Cornbread had recently

encountered while in transit.   According to plaintiff, Cornbread told him that plaintiff's co-

defendant "Grease" was "real upset" that plaintiff had "let the Feds trick [him] into turning on" his

co-defendants and that Grease "was in fact going to, you know, take care of [plaintiff's] family–the

situation that we had, you know, pre-arranged."   Plaintiff testified that the "arrangement"

referenced by Cornbread was that he and Grease had promised to take care of one another's

families if something happened to the other person.   According to plaintiff, then, he was confused

by Cornbread's message and he did not know whether Grease intended to help or hurt plaintiff's

family.   Plaintiff did not press Cornbread for any additional information.   Cornbread told plaintiff

that he "needed to talk to [him] later on" and plaintiff agreed.   Plaintiff testified that the subject

matter of the conversation "concerned" him because he knew that the fact that he had cooperated

was "getting ready to come out."

Immediately after his conversation with Cornbread, plaintiff located defendant Anderson,

plaintiff's case manager.   Prior to September 1, 1999, plaintiff had never spoken to defendant

Anderson about any concern regarding his safety.   On that day, plaintiff advised Ms. Anderson

about his conversation with Cornbread, including that Cornbread knew that plaintiff had cooperated

with the government.   Plaintiff did not tell Ms. Anderson that he felt threatened.[1]   In any event, Ms.

---

[1]The court notes that plaintiff's verified complaint contradicts his sworn deposition
testimony in several respects.  For example, plaintiff alleged in his verified complaint that

Anderson advised plaintiff that he could go into protective custody but that he could end up staying in protective custody for an indefinite–and perhaps lengthy–period of time.   Plaintiff declined the opportunity to go into protective custody and instead told Ms. Anderson that he wanted to transfer out of USP Leavenworth because the fact that he had cooperated was "coming out."   Ms. Anderson advised plaintiff that he would not be eligible for a transfer unless a threat from Cornbread could be verified and, to do so, she would need Cornbread's real name.   She further advised him that they would seek assistance from defendant Loftness, the Inmate Systems Manager at USP Leavenworth, in ascertaining Cornbread's real name.

Later that day, plaintiff met Cornbread in the rec yard along with fifteen to twenty other inmates–all of whom, including plaintiff and Cornbread, were from North Carolina.   The purpose of the meeting was to come to an agreement that all of the "Carolina" inmates would look out for one another and protect each other inside the prison.   Plaintiff was unable to ascertain Cornbread's

---

Cornbread had threatened his life and that he made this specific threat known to defendants
Anderson and Loftness.  In response to detailed questions in his deposition about the
Cornbread incident, plaintiff never remotely suggested that Cornbread threatened him in any
way.  While the court could consider the verified complaint as an affidavit for purposes of
summary judgment, *see Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1988), plaintiff has
not directed the court's attention to the verified complaint or any other document in response
to the motion for summary judgment.  Moreover, he does not mention any of the contradictory
facts from his verified complaint in his response to the motion for summary judgment.  The
statements made by plaintiff in his verified complaint, then, are left outside the realm of
relevant evidence on summary judgment. *See Daugherity v. Traylor Bros., Inc*., 970 F.2d 348,
355 n.9 (7th Cir. 1992).  Even if the court could consider the statements on summary
judgment, those statements have been contradicted by plaintiff in his subsequent deposition
testimony and, thus, no factual issues are created by those statements. *See id.*; *Kaltman-
Glasel v. Dooley*, 228 F. Supp. 2d 101, 107-08 (D. Conn. 2002) (plaintiff cannot create
genuine issue of material fact by contradicting deposition testimony with previous verified
complaint).

real name during this meeting and Cornbread did not state anything to plaintiff about their earlier conversation.   Plaintiff thereafter reported to defendant Anderson that he had been unable to get Cornbread's real name and defendant Anderson repeated her suggestion that they enlist the help of defendant Loftness in an effort to identify Cornbread.

Thus, on that same day, September 1, 1999, plaintiff approached Mr. Loftness at meal time. Mr. Loftness was standing with Ms. Anderson who, plaintiff presumes, had just briefed him on the situation with Cornbread and the need to discover Cornbread's real name.   Plaintiff advised Mr. Loftness that Cornbread had delivered a message to him and that he knew plaintiff's case.   Plaintiff also pointed out Cornbread, who was standing near the meal tray rack, to Mr. Loftness.   At that same time, plaintiff submitted to defendant Loftness an Inmate Request to Staff Member form (known in prison slang as a "cop out") in which plaintiff stated in writing what he had explained verbally to defendant Loftness, primarily that Cornbread knew his case and knew that he had cooperated with the government, and in which he apparently requested a transfer to another facility.   Defendant Loftness advised plaintiff that he would check into it and would pass it on to the "proper channels."   Plaintiff had no further contact with defendant Loftness.

According to the record before the court, plaintiff's incarceration then proceeded without complaint or incident for the next ten weeks.   Plaintiff does not allege that he received any threats of any kind during this time frame.   He does not recall seeing Cornbread at any time after September 1, 1999 and Cornbread was not housed in plaintiff's unit. On November 19, 1999, plaintiff met with his unit team, including defendant Anderson and defendant Ashman, plaintiff's

4

unit manager.   At that time, defendants Anderson and Ashman advised plaintiff that the court in his underlying case had granted plaintiff's Rule 35 motion based on plaintiff's cooperation and that plaintiff was eligible for a different custody level and a transfer out of the facility in light of his point change.   Plaintiff advised defendant Ashman of his conversation with Cornbread but did not inform defendant Ashman of any threat to his safety.   In fact, plaintiff told defendant Ashman that everything "was going all right" other than the fact that Cornbread knew he had cooperated and had relayed a message from his co-defendant.   Plaintiff did not speak to defendant Ashman at any other time regarding Cornbread or any perceived threat to plaintiff's safety.

On November 21, 1999, two days after plaintiff's unit team meeting, the prison experienced a full-scale power outage, leaving the facility in near blackness.   At the time of the outage, plaintiff was in another inmate's cell.   After about ten minutes, plaintiff returned to his own cell but did not lock his cell door because his cell mate had not yet returned to the cell.   During the power outage, an inmate known as "Slim" came to plaintiff's cell wanting something to eat. While plaintiff and Slim were sitting in the cell, another inmate known as "Jay Loc" stopped at plaintiff's cell and asked Slim who he was talking to.   After Slim responded to Jay Loc, Jay Loc left.   Slim then left plaintiff's cell and plaintiff stayed in his cell in the dark.   Then, three inmates, including Jay Loc and two inmates whose identities were unknown to plaintiff, entered plaintiff's cell.   Plaintiff had not had any problems with Jay Loc prior to this time.   When plaintiff asked what they wanted, one of the unknown inmates responded, "Shut up, you hot motherfucker."   According to plaintiff, the term "hot" means "cooperator."   The inmates assaulted plaintiff with a blunt object and he sustained severe injuries to his head and face.

5

At the time of the assault, defendant Beard served as the Special Investigative Services Lieutenant at USP Leavenworth.   Prior to the date of the assault, plaintiff had never spoken to or had any contact with defendant Beard.   Defendant Beard interviewed plaintiff on two occasions after the assault.   During the second interview, plaintiff asked defendant Beard whether he had received plaintiff's cop-out.   According to plaintiff, defendant Beard responded that he had received it, had verified that plaintiff had no separatees on the compound and then threw the cop-out away.

## II.     Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."  Fed. R. C`iv. P. 56(c).   In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.   *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).   A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."   *Wright ex rel. Trust Co. of Kansas v. Abbott Laboratories, Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).   An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."   *Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue

of material fact and entitlement to judgment as a matter of law. *Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. American Guarantee & Liability Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore, Oklahoma*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibits incorporated therein." *Adams,* 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and in-expensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

### III.   Discussion

Plaintiff's *Bivens* claims against defendants are based on defendants' alleged failure to protect plaintiff from the November 21, 1999 assault in violation of the Eighth Amendment.   It is well established that prison officials have a duty to protect prisoners from violence at the hands of other prisoners.   *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).   The Eighth Amendment, however, is not violated unless a prison official shows "deliberate indifference" to a "substantial risk of serious harm to an inmate."   *Id.* at 828.   To establish a cognizable Eighth Amendment claim for failure to protect, the plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm (the objective component), and that the prison official was deliberately indifferent to his safety (the subjective component).   *Verdecia v. Adams*, 327 F.3d 1171, 1175 (10th Cir. 2003).

Defendants move for summary judgment on the grounds that plaintiff has failed to set forth facts establishing either component of the test.   In the alternative, defendants assert that they are qualifiedly immune from plaintiff's claims.   As explained below, the court concludes that plaintiff has not demonstrated the existence of genuine issues of material fact as to whether any defendant had the required culpable mental state with respect to plaintiff's safety and that summary judgment is therefore warranted in defendants' favor.   The court, then, declines to address defendants' other arguments in support of their motion.

The Supreme Court in *Farmer*, consistent with earlier cases, held that a "prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer*, 511 U.S. at 828. The Court stated:

> [A] prison official cannot be found liable under the Eighth Amendment for denying
> an inmate humane conditions of confinement unless the official knows of and
> disregards an excessive risk to inmate health or safety; the official must both be
> aware of facts from which the inference could be drawn that a substantial risk of
> serious harm exists, and he must also draw the inference.

*Id*. at 837.   This subjective standard requires a culpable state of mind on the part of the official. *Gonzales v. Martinez*, 403 F.3d 1179, 1186 (10th Cir. 2005).   It is not satisfied by negligence (which, by definition, is an unreasonable act or omission), or even gross negligence, or recklessness as defined by civil law.   *Brigden v. State of Oklahoma*, 1997 WL 687674, at *6 (10th Cir. Oct. 29, 1997) (citing *Farmer*, 511 U.S. at 835-37 & n. 4; *Barrie v. Grand County*, 119 F.3d 862, 869 (10th Cir. 1997) (citing *Berry v. City of Muskogee*, 900 F.2d 1489, 1495-96 (10th Cir. 1990))).   It requires a level of recklessness tantamount to criminal recklessness, inclusive of a subjective *mens rea*. *See id.* (citing *Farmer*, 511 U.S. at 836, 839-40).

No reasonable jury could conclude from the facts presented here that any of the defendants had the requisite culpable state of mind.   Of all the defendants, defendant Anderson certainly knew the most about plaintiff's concerns (indeed, plaintiff concedes that defendant Anderson had the most information of the defendants) and, immediately upon hearing plaintiff's concerns on September 1, 1999, she offered to place plaintiff in protective custody.   He declined, preferring instead a transfer to another facility.   Clearly, then, plaintiff did not perceive a serious threat to his own safety and his refusal to enter protective custody is a significant factor in evaluating whether prison officials were subjectively criminally reckless in perceiving an unreasonable risk to plaintiff, in actually drawing the inference, and in failing to act.   *See Brigden*, 1997 WL 687674, at *7.   As the Tenth Circuit has recognized, albeit in an unpublished opinion, a prisoner's

refusal to choose protective custody is highly relevant as to the state of mind and culpability of prison officials:

> [The plaintiff's] own actions in . . . refusing the offer of protective custody become relevant as to the state of mind of all the defendants and as to their culpability. First, while it may be argued that prison officials have superior knowledge about dangers posed by the prison environment, and about particularly dangerous inmates, no one could have had a more intimate interest in assessing threats to [the plaintiff's] safety than [the plaintiff] himself. . . . If [the plaintiff] did not feel sufficiently threatened to choose protective custody at OSP, it is hard to see why prison officials were not entitled to take this into account in their own risk assessment.

*Brigden*, 1997 WL 687674, at *7. Ultimately, the Circuit affirmed the grant of summary judgment to the defendants in *Brigden*, concluding that the officials were not deliberately indifferent because they took reasonable steps (offering protective custody) to abate the risk. *See id.*

Plaintiff suggests that he declined protective custody because defendant Anderson advised plaintiff that he could remain in protective custody for an indefinite and lengthy period of time. He also suggests that he declined protective custody because of the resulting harsh conditions. He does not suggest, however, that the conditions of protective custody were cruel and unusual and he does not dispute (indeed, he testified in his deposition) that defendant Anderson offered to place plaintiff in protective custody–a reasonable response to plaintiff's concerns. Because it is undisputed that defendant Anderson took reasonable steps to protect plaintiff from harm, no reasonable jury could find that defendant Anderson was deliberately indifferent to plaintiff's safety. *See Brown v. Ellis*, 1999 WL 197222, at *1 (7th Cir. Mar. 26, 1999) (affirming grant of summary judgment in favor of prison officials where officials offered to place inmate in

segregation and inmate declined; offer constituted reasonable step to protect inmate from harm and inmate could not establish critical element of deliberate indifference claim); *Doe v. Welborn*, 110 F.3d 520, 524-25 (7th Cir. 1997) (offering inmate protective custody is a reasonable response to threat from other inmates); *Zatler v. Wainwright*, 802 F.2d 397, 403 (11th Cir. 1986) (plaintiff could not establish prison official's deliberate indifference where plaintiff was offered protective custody even though officials discouraged inmates from seeking protective custody and conditions were harsh).

Moreover, while defendant Anderson did not offer protective custody to plaintiff at any time after September 1, 1999 (nor did plaintiff request such custody), the record reflects that plaintiff did not report to defendant Anderson any threats to his safety or any changes in his circumstances at any time after September 1, 1999. Indeed, his incarceration passed without incident until his assault on November 21, 1999. No facts, then, establish that defendant Anderson knew that plaintiff was going to be attacked and ignored the situation. At most, defendant Anderson knew that inmates who are known to have cooperated with the government may be in danger in a general prison population. Absent knowledge of any specific threat, however, defendant Anderson cannot be held liable for "culpable indifference" to plaintiff's safety. *See Brigden*, 1997 WL 687674, at *6-7 (fact that Warden knew that convicted child molesters may be in danger in a general prison population insufficient to establish deliberate indifference absent knowledge of specific threat).

For the foregoing reasons, there is no jury case against defendant Anderson, nor against the remaining defendants. Plaintiff had only one contact with defendant Loftness, on the same day that

11

he was offered and declined protective custody.  By his own testimony, plaintiff did not advise Mr. Loftness that he had been threatened; he simply advised him that Cornbread knew his case and had delivered a message.  There are no facts, then, indicating that defendant Loftness had knowledge of a specific threat to plaintiff's safety and, thus, no facts establishing that defendant Loftness was deliberately indifferent to plaintiff's safety.[2]  While Mr. Loftness may have failed to forward plaintiff's cop-out to the proper persons, such failure demonstrates only negligence and not the requisite *mens rea*.

Similarly, plaintiff had only one contact with defendant Ashman.  He met with defendant Ashman on November 19, 1999 as part of plaintiff's routine unit team review.  Plaintiff testified that he advised defendant Ashman of his conversation with Cornbread but did not inform defendant Ashman of any threat to his safety.  Moreover, plaintiff told defendant Ashman that everything "was going all right" other than the fact that Cornbread knew he had cooperated and had relayed a message from his co-defendant.  At the time of his conversation with defendant Ashman, more than ten weeks had passed since plaintiff's one and only confrontation with Cornbread and plaintiff did not report (or, from the record, experience) any threats or concerns after that time.  At the most, then, defendant Ashman knew that plaintiff had cooperated with the government and knew that at least one inmate (who was not housed in plaintiff's unit) knew that plaintiff had cooperated.  Such knowledge, in the absence of any threat made to plaintiff or reported to defendant Ashman,

---

[2]Even if plaintiff told defendant Loftness the substance of the message, the message as described by plaintiff indicates a threat to plaintiff's family–not a threat to plaintiff's own safety and it does not indicate that Cornbread himself intended to do any harm to plaintiff or his family.

simply does not establish the requisite culpable mental state. *See Brigden*, 1997 WL 687674, at *6-7 (fact that Warden knew that convicted child molesters may be in danger in a general prison population insufficient to establish deliberate indifference absent knowledge of specific threat).

Finally, the court turns to defendant Beard. Viewing the facts in the light most favorable to plaintiff, defendant Beard disregarded plaintiff's written cop-out. By plaintiff's testimony, the cop-out stated only that Cornbread knew his case and knew that he had cooperated with the government. The cop-out did not set forth any facts suggesting a threat to plaintiff's safety. As explained above, then, no reasonable jury could conclude that defendant Beard–even assuming he threw away plaintiff's cop-out–acted with deliberate indifference to plaintiff's safety.

In sum, plaintiff has not set forth sufficient facts from which a jury could reasonably conclude that any of these defendants acted with deliberate indifference to plaintiff's safety. Summary judgment, then, is granted in favor of defendants.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' motion for summary judgment (doc. #64) is granted and plaintiff's complaint is dismissed in its entirety.

**IT IS SO ORDERED** this 22nd day of September, 2005.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

13